FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

MAR 3 1 2026

KEVIN P. WEIMER, Clerk
By_____ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **JOSHUA FRIEDMAN and HANNAH FRIEDMAN** <br> **Plaintiffs,** <br><br> **v.** <br><br> **JARROD LONG and STEFANI RIZZI** <br> **Defendants.** | **1:26-CV-1727** <br><br> CASE NO.: _____ |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COME NOW Plaintiffs Hannah Friedman and Joshua Friedman (collectively, "Plaintiffs"), and file this Complaint against Defendants Jarrod Long and Stefani Rizzi (collectively, "Defendants"), and respectfully show the Court as follows:

## I. PRELIMINARY STATEMENT

1. This is a civil action arising from Defendant Jarrod Long's intentional invasion of the most private interior of Plaintiffs' marriage, the acquisition and exploitation of intimate and confidential communications without authorization, and the resulting emotional, reputational, relational, and economic harm caused to both Plaintiffs.

2. Jarrod Long did not merely encounter stray information or misunderstand the scope of a child's device. He exported and retained a dossier of Plaintiffs' married life from Hannah Friedman's iPad using Decipher TextMessage on February 29, 2024.

3. Jarrod later entered a guilty plea arising from that conduct.

4. In the plea materials, Jarrod admitted conduct charged as "knowingly and maliciously" interfering with Hannah Friedman's iPad by downloading the text communications of Hannah Friedman and Joshua Friedman without consent.

5. That admission strips away any honest suggestion of accident, misunderstanding, innocent parental concern, or casual incidental access.

6. The communications Jarrod stole were not communications to him, not communications with him, and not communications intended for him.

7. They were communications between Hannah Friedman and Joshua Friedman.

8. The stolen material was not limited to ordinary texts or mundane logistics.

9. It included sexually explicit spouse-to-spouse communications involving the breasts, clitoris, vagina, penis, masturbation, intercourse, orgasm, requests for intimate photographs, and explicit descriptions of sexual acts.

10. It included intimate visual depictions intended only for the spouses themselves.

11. It included passwords, account credentials, device-access information, and other login-related data.

12. It included financial and payment-access information.

13. It included legal and insurance-strategy communications, including proof-of-loss, compromise, appraisal, and bad-faith-related message traffic.

14. It included medication, emotional-health, fertility, and miscarriage-related discussions touching on bodily vulnerability and trauma.

15. It included private family and parenting communications exposing the internal workings of Plaintiffs' household and marriage.

16. In substance, Jarrod did not merely view messages. He stole, exploited, and weaponized the sexual, financial, medical, strategic, and familial interior of Plaintiffs' marriage.

17. Jarrod has since attempted to rewrite that invasion as lawful parental conduct.

18. In a verified pleading filed in Cherokee County, Jarrod swore that "[n]o password was required to see what the child was witnessing on the device."

19. That sworn narrative is false, misleading, materially incomplete, or some combination thereof.

20. The iPad was not simply handed to Jarrod with unrestricted access to every category of its contents.

21. The device was provided for limited child-use communication purposes.

22. Hannah had removed, disabled, or otherwise limited ordinary messaging functionality before the device went with the child.

23. On information and belief, Jarrod manipulated the iPad to put messaging functionality back on the device, restore access to message content, or otherwise reactivate a communications pathway that had been intentionally disabled or removed.

24. On information and belief, Jarrod then concealed or minimized the visibility of that restored functionality, including by placing it on a less visible page or otherwise masking how the device had been altered.

25. Those facts make clear that this was not a case of passive observation of content left openly visible to a child, but a predatory manipulation of the device to gain access to off-limits adult communications.

26. The device was passcode protected.

27. Passcode-based access mattered enough that, during the criminal investigation, law enforcement sought the password in order to retrieve data from the iPad.

28. That fact directly undercuts Jarrod's later verified effort to portray the device as openly accessible and its contents as simply visible in plain view.

29. Jarrod's "no password" narrative was not a harmless detail. It was an exculpatory rewrite designed to transform covert device manipulation and protected access into a benign child-safety story after the fact.

30. The communications Jarrod stole were not child-facing content. They were private adult communications between Hannah Friedman and Joshua Friedman.

31. Jarrod also did not stop at acquisition.

32. He used the stolen material.

33. Shortly after obtaining Plaintiffs' communications, Jarrod filed emergency custody papers portraying Joshua Friedman as violent, dangerous, abusive, intoxicated, and harmful to the minor child.

34. Those accusations were not made in a vacuum.

35. On information and belief, the unlawfully obtained communications and related message-derived information were used to support, sharpen, embolden, or operationalize that emergency campaign.

36. Jarrod then used, and on information and belief caused others to use, the fruits of the invasion to increase pressure in the custody dispute.

37. On April 30, 2024, before the emergency hearing, Jarrod's side demanded additional custody time in exchange for dropping the emergency petition.

38. That demand was reduced in stages.

39. It moved from more expansive requests down to one additional day of parenting time per month.

40. That sequence is telling.

41. If Jarrod truly believed the accusations in his emergency papers—that Joshua Friedman posed an urgent danger serious enough to justify emergency judicial intervention—those are not conditions that a fit parent bargains away for one extra day of parenting time per month.

42. A genuine child-safety emergency is not a negotiable commodity.

43. It is either an emergency or it is not.

44. By reducing the supposed emergency to a request for one extra day per month, Jarrod's side exposed the true nature of the filing: not a good-faith effort to protect a child from imminent harm, but a predatory pressure device designed to extract concessions through the exploitation of stolen private material.

45. When Hannah Friedman refused to yield to that pressure, Jarrod's side escalated.

46. Jarrod's side stated, in substance, that Jarrod possessed approximately six months of texts and images between Hannah Friedman and Joshua Friedman and that release of those materials in the hearing "wouldn't be good."

47. That was not ordinary settlement discussion.

48. It was not routine disclosure of evidence.

49. It was a shakedown.

50. It was the threatened use of unlawfully obtained intimate marital communications and images to force an official custody concession in a courthouse building immediately before judicial proceedings.

51. What Jarrod Long sought to extract was not money, not a routine litigation concession, and not a technical scheduling detail. He sought to extract parenting time by threatening the exposure of stolen intimate material. In plain terms, he exploited Hannah Friedman's sexuality in an effort to make her surrender something priceless to a mother: time with her child.

52. The coercive force of that threat derived from the nature of what Jarrod had stolen: sexually explicit spouse-to-spouse messages, intimate images, and the broader private architecture of Plaintiffs' marriage.

53. The coercive force of the threat lay not only in the existence of private communications, but in what those communications and images represented: Hannah Friedman's sexual privacy, bodily dignity, and private married life.

Jarrod Long used the threat of exposing that intimate material to pressure Hannah Friedman to yield parenting time she did not want to surrender.

54. Faced with the threat that those stolen communications and images would be exposed, Hannah Friedman broke down emotionally in the courthouse lobby.

55. Under that pressure and humiliation, Hannah Friedman agreed to a temporary arrangement she otherwise would not have accepted.

56. A temporary order followed that altered parenting time and other significant family arrangements.

57. Jarrod's use of the stolen materials in this way was not ordinary litigation hardball.

58. It was sexualized coercion and the malicious exploitation of unlawfully obtained intimate material for strategic advantage.

59. Jarrod also retained and transferred the stolen files.

60. After Hannah Friedman discovered that Jarrod possessed nude photographs of her and messages downloaded into PDF form on another device, she demanded destruction of all nude photographs, all illegally obtained messages, and all copies held by anyone else who had viewed them.

61. Jarrod did not deny the existence of those files.

62. Instead, he stated that he no longer had the files or documentation because they had all been given to his lawyer.

63. That admission is independently significant.

64. It shows that Jarrod did not merely access the material once and forget it.

65. He exported it, retained it, and transferred it onward after being told directly how invasive, humiliating, nonconsensual, and traumatic its possession was, thereby continuing to exploit material he knew he had no right to possess.

66. The unlawfully obtained materials included at least twelve intimate visual depictions of Hannah Friedman.

67. Based on Plaintiffs' review of the exported image set, those depictions included full lingerie images, cleavage images, images in panties and thong panties emphasizing Hannah Friedman's buttocks, at least one image depicting Hannah Friedman's vagina, at least one image depicting a breast with visible nipple, at least one image depicting bare breasts together with Hannah Friedman's face, and at least one shower image depicting Hannah Friedman's fully nude legs and vagina.

68. These were not generic photographs, casual selfies, or social images. They were intimate marital photographs exchanged privately between husband and wife, in trust, in vulnerability, and with the understanding that they were intended only for the eyes of Hannah Friedman's husband.

69. Jarrod had no right to possess those images, no right to retain them, no right to export them into PDF form, no right to transfer them to anyone else, and no right to weaponize them for leverage in a custody dispute.

70. The theft and possession of these intimate photographs was uniquely violating because the images exposed the most private parts of Hannah Friedman's body, including her breasts, nipples, buttocks, pubic region, and vagina, and because at least some of the images also identified her by face, body, or surrounding context.

71. Jarrod's conduct therefore did not merely invade privacy in the abstract. It stripped Hannah Friedman of sexual privacy, bodily dignity, and the security of knowing that intimate images shared only within marriage would remain within marriage.

72. Jarrod then compounded that violation by retaining the intimate images, exporting them into a transferable file set, and using or threatening to use the larger body of stolen texts and images as leverage in connection with official custody proceedings.

73. The resulting harm to Hannah Friedman was profound and lasting. Since learning what Jarrod did, Hannah Friedman has never again felt safe sharing intimate photographs or comparable sexual content in the ordinary trusting manner of a wife communicating privately with her husband, and she has

spent substantial time in counseling dealing with the humiliation, fear, violation, and trauma caused by Defendants' conduct.

74. Jarrod's guilty plea, his later false verified rewrite, the Decipher export, the passcode-protected nature of the device, the importance of that passcode to the criminal investigation, the manipulation of the iPad to restore messaging, the courthouse-lobby shakedown, the onward transfer of the files, and the lasting trauma inflicted on Plaintiffs make this case what it is: a deliberate and cruel exploitation of Plaintiffs' privacy for strategic advantage and personal injury.

75. Jarrod Long's conduct was not followed by remorse, repentance, or any meaningful effort to repair the harm he caused.

76. Even after being directly confronted with the depth of the violation, told that he had no right to possess Hannah Friedman's intimate photographs or the stolen communications, and asked to destroy the materials, Jarrod Long chose denial, minimization, and blame-shifting rather than accountability.

77. Hannah Friedman was willing to resolve the matter with honesty, acknowledgment, and destruction of the unlawfully obtained material. Jarrod Long chose the opposite course.

78. Rather than accept responsibility, Jarrod Long repeatedly attempted to cast Plaintiffs as the true wrongdoers, portray himself as the real victim, and

invert the moral posture of the case so that the people whose privacy he invaded would appear to be the aggressors.

79. Even after the iPad intrusion, Jarrod continued to exploit mistaken access points into Plaintiffs' private affairs, including using an erroneous State Farm contact as an opportunity to pry into a post-divorce insurance claim in which he no longer had any insurable interest.

80. That blame-shifting posture continued long after the original intrusion. In a later court filing dated December 2, 2025, Jarrod Long still portrayed Joshua Friedman as waging a "campaign" against him, described efforts to challenge or contain the fallout from Jarrod's own misconduct as "desperate," and attempted to reduce his criminal conduct to a mere "error," all while continuing to frame Plaintiffs as the source of the problem rather than the victims of his actions.

81. Jarrod Long's total lack of remorse, his victim-shaming, his effort to cast Plaintiffs as the villains of a story he created, and his persistent refusal to accept responsibility are evidence of callous indifference coupled with malice, and they further underscore the punitive character of the injury he inflicted.

## II. JURISDICTION AND VENUE

82. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action includes claims arising under federal law, including but not limited to claims under 18 U.S.C. §§ 2511 and 2520, 18 U.S.C. §§ 2701 and 2707, and 15 U.S.C. § 6851.

83. This Court has supplemental jurisdiction over Plaintiffs' related state-law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the federal claims and arise from the same nucleus of operative facts.

84. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants reside in this District and because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

85. At all relevant times, Defendant Jarrod Long resided in Cherokee County, Georgia, within the Northern District of Georgia.

86. At all relevant times, Defendant Stefani Rizzi resided in or could be found within the State of Georgia and, on information and belief, within this District.

87. A substantial part of the acts giving rise to this action occurred in Cherokee County, Georgia, including the acquisition, export, retention, use, threatened use, and strategic deployment of Plaintiffs' private communications and intimate images.

88. The April 30, 2024 courthouse-lobby shakedown and coercive use of the stolen communications and images occurred in Cherokee County, Georgia, within this District.

89. The emergency custody filings, the temporary proceedings, and the related strategic use and threatened use of the stolen communications all occurred in or were directed into this District.

90. The unlawfully obtained communications were communications of Hannah Friedman and Joshua Friedman, both of whom suffered direct injury from the access, use, transfer, and threatened exposure of those communications in this District.

91. The transfer, retention, and use of the stolen materials, including the transfer of files to counsel and the participation of Stefani Rizzi in documenting, processing, discussing, and helping weaponize those materials, were acts connected to and directed toward events in this District.

92. This Court therefore has both subject-matter jurisdiction and proper venue over all claims asserted herein.

## III. THE PARTIES

93. Plaintiff Hannah Friedman is a resident of the State of Georgia.

94. Plaintiff Joshua Friedman is a resident of the State of Georgia.

95. Defendant Jarrod Long is a resident of the State of Georgia and, upon information and belief, resides in Cherokee County, Georgia.

96. Defendant Stefani Rizzi is a resident of the State of Georgia and, upon information and belief, resides in or may be found in this District.

97. At all relevant times, Hannah Friedman and Joshua Friedman were the parties to the private communications unlawfully obtained by Jarrod Long. The criminal materials themselves identify the downloaded communications as the text communications of Hannah Friedman and Joshua Friedman.

98. At all relevant times, Jarrod Long was Hannah Friedman's former spouse and used that former relationship, together with his access to circumstances surrounding the child's iPad, as a vehicle to intrude into Plaintiffs' private marital communications.

99. At all relevant times, Stefani Rizzi was aligned with Jarrod Long personally and strategically, participated in discussions about Plaintiffs, and, on information and belief, actively assisted in the documentation, processing, discussion, escalation, and weaponization of unlawfully obtained communications and message-derived information.

## IV. FACTUAL ALLEGATIONS

### A. Relationship background and Jarrod Long's motive

100. Hannah Friedman and Jarrod Long are former spouses and share a minor child.

101. Hannah Friedman and Jarrod Long had been separated for a substantial period before Hannah Friedman and Joshua Friedman began their relationship. Hannah Friedman and Joshua Friedman later married.

102. Because the divorce and parenting arrangement were consented to only six months prior, Jarrod Long had a strong motive to portray Joshua Friedman as the supposed "material change in circumstances" necessary to reopen, destabilize, and gain leverage in the custody case.

103. Jarrod Long acted on that motive by building a narrative in which Joshua Friedman was cast as the newly introduced source of danger, instability, and urgency.

104. That narrative later appeared expressly in Jarrod Long's emergency custody filings, where Joshua Friedman was presented as violent, dangerous, abusive, intoxicated, and harmful to the minor child.

## B. Jarrod Long's unlawful acquisition of Plaintiffs' communications

105. On or about February 28, 2024 through February 29, 2024, Jarrod Long intentionally obtained private electronic communications between Hannah Friedman and Joshua Friedman without authorization or consent.

106. The resulting export file states on its face that it was generated from "Hannah's iPad" using Decipher TextMessage on February 29, 2024,

confirming a deliberate extraction event rather than casual or incidental viewing.

107.    Those communications included private marital messages, personal and intimate discussions, explicit sexual communications, intimate visual depictions, passwords and credentials, financial-access information, medication and fertility discussions, insurance and legal-strategy communications, and private family communications.

108.    Jarrod Long had no lawful right to access those communications.

109.    The communications were private, confidential, and not intended for Jarrod Long.

110.    In the criminal matter arising from that conduct, the accusation alleged that Jarrod Long did "knowingly and maliciously" interfere with Hannah Friedman's iPad by downloading the text communications of Hannah Friedman and Joshua Friedman without her consent.

111.    Jarrod Long later entered a guilty plea arising from that conduct. In the plea materials, he admitted the unlawful acts set forth in the charge to which he pled.

112.    The communications identified in the criminal papers were expressly the communications of both Plaintiffs, not merely one Plaintiff.

## C. Why the access was clearly off-limits

113. The iPad at issue was not provided to Jarrod Long as a general license to inspect, export, restore, retain, or weaponize Hannah Friedman's private communications with Joshua Friedman.

114. The device was provided for limited child-use communication purposes.

115. Hannah Friedman had removed, disabled, or otherwise limited ordinary messaging functionality before the device went with the child.

116. On information and belief, Jarrod Long manipulated the iPad to put messaging functionality back on the device, restore access to message content, or otherwise reactivate a communications pathway that had been intentionally disabled or removed.

117. On information and belief, Jarrod Long then concealed or minimized the visibility of that restored functionality, including by placing it on a less visible page or otherwise masking how the device had been altered.

118. Jarrod Long therefore did not merely access a device that happened to contain private material; on information and belief, he altered the device itself by restoring messaging functionality that Hannah Friedman had removed or disabled, thereby converting a limited child-use iPad into a surveillance instrument aimed at the private marital communications of two adults.

119. The device was passcode protected.

120. Passcode-based access mattered enough that, during the criminal investigation, law enforcement sought the password in order to retrieve data from the iPad.

121. Those circumstances are incompatible with any later suggestion that the communications were merely visible in plain view to anyone casually looking at the device.

122. The communications Jarrod Long ultimately obtained were not communications with the child and were not communications directed to Jarrod Long. They were private adult communications between Hannah Friedman and Joshua Friedman.

## D. Jarrod Long's false verified rewrite of the access

123. After unlawfully obtaining Plaintiffs' private communications, Jarrod Long attempted to recast that conduct as lawful parental review of material supposedly left openly visible to the minor child.

124. In a verified pleading filed in Cherokee County on or about August 7, 2024, Jarrod Long asserted under oath that "No password was required to see what the child was witnessing on the device."

125. That verified assertion was false, misleading, materially incomplete, or some combination thereof.

126. Jarrod Long's verified "no password" narrative is inconsistent with the passcode-protected nature of the device, inconsistent with the allegation and plea materials describing malicious downloading of Hannah and Joshua's communications without consent, and inconsistent with the nature and volume of the exported material itself.

127. Jarrod Long's false verified account was part of a broader attempt to rewrite covert, unauthorized access to Plaintiffs' private marital communications as benign parental conduct.

128. These contradictions are evidence of consciousness of wrongdoing, bad faith, and a deliberate effort to conceal the true nature of Defendant's conduct.

**E. Jarrod Long's theft of the sexual, financial, medical, strategic, and familial interior of Plaintiffs' marriage**

129. The material Jarrod Long unlawfully obtained included sexually explicit spouse-to-spouse communications using anatomical terms and explicit sexual descriptions, including communications involving the breasts,

clitoris, vagina, penis, masturbation, intercourse, orgasm, and requests for intimate photographs.

130. The exported thread also contains intimate visual depictions and sexually suggestive body images exchanged within the marriage and intended only for the spouses themselves.

131. The exported thread contains passwords and credentials, including a Lowe's login and password and a computer login password, as well as other account-access information.

132. The exported thread contains financial, payment, and account-related communications, including billing and access discussions.

133. The exported thread contains medication, emotional-health, fertility, and miscarriage-related communications, including discussions of prescriptions, emotional and physical distress, reproductive loss, and the effect of those matters on Plaintiffs' marriage.

134. The exported thread contains legal and insurance-strategy communications, including proof-of-loss instructions, compromise offers, appraisal strategy, adjuster-management guidance, and related claims handling discussions.

135. The exported thread contains private family and parenting communications involving children, ex-spouses, household dynamics, and family logistics.

136. Jarrod Long therefore stole not only intimacy, but also security, strategy, medical vulnerability, financial information, and family architecture.

## F. Intimate images and the resulting trauma to Hannah Friedman

137. The unlawfully obtained materials included at least twelve intimate visual depictions of Hannah Friedman.

138. Based on Plaintiffs' review of the exported image set, those depictions included, among other things, full lingerie images, cleavage images, images in panties and thong panties emphasizing Hannah Friedman's buttocks, at least one image depicting Hannah Friedman's vagina, at least one image depicting a breast with visible nipple, at least one image depicting bare breasts together with Hannah Friedman's face, and at least one shower image depicting Hannah Friedman's fully nude legs and vagina.

139. These were not generic photographs, casual selfies, or social images.

140.    They were intimate marital photographs exchanged privately between husband and wife, in trust, in vulnerability, and with the understanding that they were intended only for the eyes of Hannah Friedman's husband.

141.    Jarrod Long had no right to possess those images, no right to retain them, no right to export them into PDF form, no right to transfer them to anyone else, and no right to weaponize them for leverage in a custody dispute.

142.    The theft and possession of these intimate photographs was uniquely violating because the images exposed the most private parts of Hannah Friedman's body, including her breasts, nipples, buttocks, pubic region, and vagina, and because at least some of the images also identified her by face, body, or surrounding context.

143.    Jarrod Long's conduct therefore did not merely invade privacy in the abstract. It stripped Hannah Friedman of sexual privacy, bodily dignity, and the security of knowing that intimate images shared only within marriage would remain within marriage.

144.    Jarrod Long then compounded that violation by retaining the intimate images, exporting them into a transferable file set, and using or threatening to use the larger body of stolen texts and images as leverage in connection with official custody proceedings.

145. The resulting harm to Hannah Friedman was profound and lasting.

146. Since learning that Jarrod Long possessed and weaponized her intimate photographs, Hannah Friedman has never again felt safe sharing intimate photographs or comparable sexual content in the ordinary trusting manner of a wife communicating privately with her husband.

147. What Jarrod Long did permanently altered Hannah Friedman's sense of safety, trust, and sexual privacy inside her marriage.

148. Hannah Friedman has spent substantial time in counseling dealing with the humiliation, fear, violation, and trauma caused by Jarrod Long's conduct.

149. The emotional injury caused by Jarrod Long's possession and weaponization of Hannah Friedman's intimate photographs has included shame, mortification, hypervigilance, ongoing fear of further exposure, and a persistent inability to feel secure that her private sexual communications and images will remain private.

150. Jarrod Long knew, or at minimum acted with reckless disregard of the near certainty, that stealing and retaining intimate marital photographs of his former wife, and then using the larger body of stolen communications and images as leverage, would cause precisely this kind of trauma.

151.    The harm was not speculative. It was immediate, severe, and enduring.

## G. Jarrod Long turned Joshua Friedman into the engine of the emergency narrative

152.    Shortly after acquiring Plaintiffs' private communications, Jarrod Long filed an emergency motion, supporting brief, and counterclaim in response to Hannah's motion to hold Jarrod in contempt of their parenting plan. This was filed in Cherokee County and designed to cast Joshua Friedman as the reason emergency intervention was supposedly necessary.

153.    In those filings, Jarrod Long accused Joshua Friedman of violent tendencies, causing Hannah Friedman to sleep in her car from fear, mutilating the minor child's pet, drinking alcohol "in excess," imposing unsafe discipline, and otherwise endangering the child and household.

154.    Those accusations were false, materially false, grossly exaggerated, unlawfully sourced, or some combination thereof.

155.    Jarrod Long's purpose was not merely to express concern. It was to create a litigation emergency by making Joshua Friedman the focal point of a supposed new danger.

156.    The sequence of events supports the inference that the unlawfully obtained communications and related information were used to support, sharpen, embolden, or operationalize that campaign.

## H. The courthouse-lobby shakedown and sexualized coercion

157.    On April 30, 2024, the parties and their counsel appeared in Cherokee County for the scheduled temporary emergency hearing.

158.    Hannah Friedman was accompanied by Joshua Friedman and multiple supportive family members and friends.

159.    Jarrod Long was accompanied by Stefani Rizzi and his family members.

160.    Before the hearing, Jarrod Long's side demanded additional custody time in exchange for dropping the emergency petition.

161.    That demand was reduced in stages but remained a demand for increased custody time in exchange for abandoning an emergency claim that Jarrod Long had chosen to file.

162.    If Jarrod Long truly believed the accusations in his emergency papers—that Joshua Friedman posed an urgent danger to the child—those are not conditions that a fit parent bargains away for one additional day of parenting time per month.

163. A genuine child-safety emergency is not something a parent trades for a marginal scheduling adjustment.

164. By reducing the supposed emergency to a request for one extra day per month, Jarrod Long's side exposed the true nature of the filing: not a good-faith effort to protect a child from imminent harm, but a pressure device designed to extract concessions.

165. When Hannah Friedman initially refused, counsel for Jarrod Long stated, in substance, that Jarrod Long possessed six months of texts and images between Hannah Friedman and Joshua Friedman and that release of those materials in the hearing "wouldn't be good."

166. That statement revealed that Jarrod Long had obtained and was prepared to use Plaintiffs' private communications, including intimate material, as leverage.

167. The threatened exposure of Plaintiffs' private marital communications and intimate images caused Hannah Friedman to collapse emotionally in the courthouse lobby.

168. Under the weight of that threat and humiliation, Hannah Friedman agreed to a temporary arrangement she otherwise would not have accepted.

169. A temporary consent order was then entered addressing therapy, exchanges, Our Family Wizard, the appointment of a GAL, parenting time, and child support.

170. Jarrod Long's use of the stolen materials in this manner was sexualized coercion and a malicious use of unlawfully obtained intimate material for strategic advantage.

## I. Continued retention and transfer of the stolen files

171. After Hannah Friedman later discovered that Jarrod Long possessed nude photographs of her and messages downloaded into PDF form on another device, she demanded in writing that he destroy all nude photographs of her, all illegally obtained messages, and all copies held by anyone else who had viewed them.

172. Jarrod Long did not deny the existence of those materials.

173. Instead, he stated that he no longer had the files or documentation because they had all been given to his lawyer.

174. That admission establishes, at minimum, the fact that Jarrod transferred the stolen files onward after acquiring and retaining them.

175.    That transfer is independently significant because it shows the stolen materials were not merely viewed once, but preserved, maintained, and affirmatively used.

176.    Jarrod Long cannot launder unlawfully obtained intimate material through counsel. His decision to give the stolen file set to an attorney may raise separate questions about later privileged legal advice, but it does not erase the fact that he exported, retained, transferred, and used communications and images he had no right to possess in the first place.

## J. Stefani Rizzi's active participation in documentation, escalation, and weaponization

177.    Jarrod Long admitted in deposition that when he "found the messages," he called Stefani Rizzi.

178.    He further admitted that Stefani Rizzi advised him concerning the app associated with handling, backing up, or preserving those messages.

179.    The Jarrod–Stefani thread shows that Stefani was actively involved in helping Jarrod document allegations and shape strategy. She told him, for example, that they needed to "really document these things babe."

180. The same thread shows Stefani offering operational help in processing materials, including "Send it to me and I can on my phone," in response to Jarrod describing the need to make a long document into a PDF.

181. The same thread shows Stefani advising on police-report tactics, TPO strategy, service, hearings, and how certain facts or responses would "look."

182. The same thread shows Stefani amplifying accusations about Joshua Friedman, Plaintiffs' home, alleged instability, and alleged danger to the child, including references to Joshua having "current DV situations" and to the house being unsafe or unstable.

183. The same thread shows Stefani's awareness that the iPad issue involved nude-image content, including her reference to "the iPad that SHE SENDS NUDES ON."

184. The same thread reflects surveillance-style discussion about Plaintiffs' fence, yard, home visibility, school exchange timing, and what could be seen or inferred from outside observation.

185. On information and belief, and as Jarrod Long's own discovery responses indicate, Stefani Rizzi was not merely aware of the tactic at issue but helped originate, shape, accelerate, or operationalize it.

186.    On information and belief, Stefani Rizzi received, reviewed, discussed, and helped weaponize at least part of the unlawfully obtained communications and associated records.

## K. Jarrod Long's later refusals to explain under oath

187.    In later deposition testimony, Jarrod Long repeatedly refused to answer questions concerning the unlawfully obtained messages and the sourcing of major accusations he had made.

188.    He broadly indicated that questions about the text messages obtained on the iPad implicated his privilege against self-incrimination.

189.    He also refused to identify what "messages" he meant when he said he called Stefani Rizzi after he "found the messages."

190.    Those refusals support the inference that the accusations and pressure campaign were built from unlawful access to Plaintiffs' communications and the exploitation of what Jarrod Long found there.

## L. Jarrod Long's Continued Attempts to Pry Into Plaintiffs' Private Affairs

191.    Jarrod Long's invasion of Plaintiffs' private affairs did not end with the unlawful acquisition of Plaintiffs' marital communications.

192.    After the divorce, Hannah Friedman held a State Farm claim relating to a September 13, 2023 loss. State Farm's own records show that Jarrod Long was contacted in connection with the claim and, rather than immediately and clearly disclaiming any role or interest, used the contact to pry into the file and feign ignorance as to who Joshua Friedman was, despite knowing exactly who he was.

193.    State Farm later documented that the selling agency confirmed Jarrod Long was no longer listed as an insured on the policy and had no current interest in the policy.

194.    State Farm's payment history further reflects that claim payments initially listed Jarrod Long as a payee and were later voided and reissued without him, consistent with later correction of his improper inclusion in the claim handling stream.

195.    On information and belief, Jarrod Long used State Farm's mistaken contact as an opportunity to pry into Hannah and Joshua Friedman's private insurance claim and to gather information to which he had no present right.

196.    This incident further reflects a continuing pattern: when Jarrod Long perceived an opening into Plaintiffs' private affairs, he exploited it in a predatory and opportunistic way rather than respecting obvious boundaries.

197.     This was not an isolated lapse. It reflected Jarrod Long's continuing willingness to exploit mistaken access points into Plaintiffs' private affairs whenever an opening appeared.

## M. Jarrod Long's continued lack of remorse and blame-shifting

198.     Jarrod Long's conduct was not followed by remorse, repentance, or any meaningful effort to repair the harm he caused.

199.     Even after being directly confronted with the depth of the violation, told that he had no right to possess Hannah Friedman's intimate photographs or the stolen communications, and asked to destroy the materials, Jarrod Long chose denial, minimization, and blame-shifting rather than accountability.

200.     Hannah Friedman was willing to resolve the matter with honesty, acknowledgment, and destruction of the unlawfully obtained material. Jarrod Long chose the opposite course.

201.     Rather than accept responsibility, Jarrod Long repeatedly attempted to cast Plaintiffs as the true wrongdoers, portray himself as the real victim, and invert the moral posture of the case so that the people whose privacy he invaded would appear to be the aggressors.

202.    That blame-shifting posture continued long after the original intrusion. In a later court filing dated December 2, 2025, Jarrod Long still portrayed Joshua Friedman as waging a "campaign" against him, described efforts to challenge or contain the fallout from Jarrod's own misconduct as "desperate," and attempted to reduce his criminal conduct to a mere "error," all while continuing to frame Plaintiffs as the source of the problem rather than the victims of his actions.

203.    Jarrod Long's total lack of remorse, his victim-shaming, his effort to cast Plaintiffs as the villains of a story he created, and his persistent refusal to accept responsibility are evidence of callous indifference, calculated exploitation, and malice.

## N. Harm to Hannah Friedman

204.    Jarrod Long's conduct caused severe emotional distress to Hannah Friedman.

205.    Hannah Friedman suffered humiliation, panic, fear, loss of sexual privacy, loss of emotional security, and persistent trauma resulting from the unlawful access, retention, transfer, and threatened use of her private marital communications and intimate images.

206.    After these events, Hannah Friedman was diagnosed by her counselor with post-traumatic stress disorder related to what Jarrod Long did and the resulting fallout.

207.    Hannah Friedman has incurred therapy and counseling expenses and continues to suffer ongoing emotional injury.

## O. Harm to Joshua Friedman

208.    Jarrod Long's conduct directly invaded Joshua Friedman's privacy because the unlawfully obtained communications were communications between Hannah Friedman and Joshua Friedman.

209.    Joshua Friedman was also directly targeted in Jarrod Long's emergency narrative as the supposed source of a material change in circumstances and a danger to the child.

210.    As a direct and proximate result, Joshua Friedman suffered emotional distress, reputational harm, disruption to his marriage, impairment of the privacy and safety of his marital communications, lost work and productivity, and spillover burden and exposure in his own custody-related matters.

**P. Discovery of the Wrongful Access and Delayed Discovery of Its Full Scope**

211.    Plaintiffs did not have a reasonable opportunity to discover the full existence, nature, and scope of Jarrod Long's unlawful acquisition, retention, export, transfer, and weaponization of Plaintiffs' private communications at the time the access first occurred.

212.    At the time Jarrod Long unlawfully acquired Plaintiffs' communications, Plaintiffs did not know the full extent of what had been taken, how it had been obtained, whether messaging functionality had been restored or concealed, whether the material had been exported into a file set, or to whom the material had been transferred or made accessible.

213.    Plaintiffs first became aware, at minimum, of the practical use of the stolen material on or about April 30, 2024, when Jarrod Long's side invoked the existence of months of texts and images between Plaintiffs as leverage immediately before the emergency hearing.

214.    Even then, Plaintiffs did not yet know the full scope of what had been taken, whether intimate images had been preserved in export form, whether the materials had been transferred onward, or how broadly the materials had been retained, circulated, processed, or weaponized.

215.    Plaintiffs later learned additional critical facts in stages, including that the communications had been exported from Hannah Friedman's iPad using

Decipher TextMessage on February 29, 2024, that intimate photographs had been included in the unlawfully obtained materials, and that Jarrod Long had stated the files were no longer in his possession because they had been given to his lawyer.

216. Plaintiffs further learned, through later records, filings, discovery, and related proceedings, additional facts bearing on the scope of the intrusion, the false rewrite of the access, the transfer and use of the files, and Stefani Rizzi's participation in the documentation, processing, and weaponization of the unlawfully obtained materials.

217. Plaintiffs could not, through the exercise of reasonable diligence, have discovered earlier all material facts concerning the full nature, scope, onward transfer, and resulting injury caused by Defendants' conduct, because those facts were concealed, denied, minimized, falsely rewritten, or uniquely within Defendants' knowledge and control.

218. To the extent any claim asserted herein is subject to a discovery rule, delayed accrual rule, equitable tolling principle, fraudulent concealment principle, or similar doctrine, Plaintiffs plead those doctrines in the alternative and allege that their claims were brought within the applicable limitations period measured from the time the claims were or reasonably could have been discovered.

## COUNT I: INVASION OF PRIVACY — INTRUSION UPON SECLUSION

219. Plaintiffs incorporate by reference Paragraphs 1 through 218 as if fully set forth herein.

220. Plaintiffs had a reasonable expectation of privacy in their private electronic communications, marital text messages, intimate discussions, intimate visual depictions, passwords and credentials, financial-access information, health and fertility discussions, legal and insurance-strategy communications, and private family communications exchanged between one another.

221. Those materials were not public, not intended for Defendant Jarrod Long, and not authorized for his inspection, export, retention, use, or threatened use.

222. Defendant Jarrod Long intentionally intruded upon Plaintiffs' private affairs in a predatory manner by accessing, obtaining, downloading, restoring, reviewing, retaining, exporting, and exploiting those communications and associated materials without authorization or consent.

223. The iPad at issue was not provided to Defendant Jarrod Long as a license to inspect Hannah Friedman's private communications with her husband.

224. The fact that the minor child possessed the iPad for limited communication purposes did not grant Defendant Jarrod Long permission to bypass restrictions, restore disabled messaging functions, search for hidden communications, export private data, or review intimate marital messages between two adults.

225. Hannah Friedman had removed, disabled, or otherwise limited messaging functionality before the device went with the child.

226. On information and belief, Defendant Jarrod Long manipulated the iPad to put messaging functionality back on the device, restore access to message content, or otherwise reactivate a communications pathway that had been intentionally disabled or removed.

227. On information and belief, Defendant Jarrod Long then concealed or minimized the visibility of that restored functionality, including by placing it on a less visible page or otherwise masking how the device had been altered.

228. The device was passcode protected.

229. Passcode-based access mattered enough that, during the criminal investigation, law enforcement sought the password in order to retrieve data from the iPad.

230. Defendant Jarrod Long's later verified assertion that "[n]o password was required to see what the child was witnessing on the device" was false, misleading, materially incomplete, or some combination thereof.

231. Defendant Jarrod Long therefore did not merely misuse information already lawfully open to him. He entered and exploited areas that were off limits to him, including private communications and related materials belonging to and exchanged by Plaintiffs.

232. The communications unlawfully obtained were not communications between Defendant Jarrod Long and the child, and were not communications directed to Defendant Jarrod Long. They were communications between Hannah Friedman and Joshua Friedman.

233. The material unlawfully obtained included, among other things, sexually explicit spouse-to-spouse communications involving the breasts, clitoris, vagina, penis, masturbation, intercourse, orgasm, and requests for intimate photographs; intimate visual depictions; passwords and credentials; financial-access information; medication and fertility discussions; legal and insurance-strategy communications; and private family communications.

234. Defendant Jarrod Long admitted, in written plea materials, conduct charged as "knowingly and maliciously" interfering with Hannah

Friedman's iPad by downloading the text communications of Hannah Friedman and Joshua Friedman without consent.

235. In this civil action, that guilty plea is admissible as an admission against interest and powerful evidence of the facts admitted.

236. Defendant Jarrod Long cannot erase his written admission of unlawful, malicious access by rebranding the same conduct as benign, lawful, or parental in nature.

237. To the extent Defendant Jarrod Long attempts to contradict his prior written admission by offering a later flat denial of unlawfulness unsupported by a credible explanation, such contradiction should not create a genuine factual dispute sufficient to defeat liability, particularly where the record reflects covert device manipulation, restoration of disabled messaging functions, passcode-protected access, export of the data using Decipher TextMessage, and targeted acquisition of private communications between two adults.

238. Defendant Jarrod Long's conduct was not ordinary parental supervision, not routine device review, and not a good-faith child-protection measure.

239. It was covert, predatory surveillance into the private marital affairs of Plaintiffs.

240.     The intrusion was substantial, deliberate, offensive, and of a kind that would be highly offensive to a reasonable person, particularly because the communications included intimate marital content, intimate visual depictions, private health and fertility information, passwords and credentials, and legal and financial strategy.

241.     Georgia law recognizes invasion of privacy by intrusion upon seclusion where a defendant engages in unreasonable and highly offensive prying into another's private concerns.

242.     Because the communications unlawfully obtained were communications between both Plaintiffs, both Plaintiffs were direct victims of the intrusion.

243.     As a direct and proximate result of Defendant Jarrod Long's intrusion upon Plaintiffs' seclusion and private affairs, Plaintiffs suffered actual injury, including emotional distress, humiliation, relational harm, loss of sexual privacy, therapy expenses, lost work, consequential damages, and other damages in an amount to be proven at trial.

244.     Defendant Jarrod Long's conduct was willful, malicious, and undertaken with conscious disregard of Plaintiffs' rights, thereby warranting punitive damages.

## COUNT II: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

245.    Plaintiffs incorporate by reference Paragraphs 1 through 244 as if fully set forth herein.

246.    Defendant Jarrod Long engaged in intentional, malicious, extreme, and outrageous conduct by unlawfully acquiring Plaintiffs' private marital communications and then retaining, exporting, transferring, discussing, threatening to use, and using the fruits of that invasion for leverage in a custody dispute and in Plaintiffs' private affairs more broadly.

247.    Defendant Jarrod Long's conduct did not consist of mere argument, ordinary litigation posturing, routine family-law conflict, or a single impulsive mistake.

248.    Jarrod Long intentionally obtained sexually explicit spouse-to-spouse communications, intimate visual depictions, passwords and credentials, financial-access information, medication and fertility discussions, legal and insurance-strategy communications, and private family communications belonging to and exchanged by Plaintiffs.

249.    Jarrod Long then exploited that stolen material into a pressure instrument.

250.    In the courthouse lobby on April 30, 2024, Jarrod Long's side reduced purportedly grave emergency allegations to a bargaining demand for additional parenting time and, when Hannah Friedman did not yield,

escalated by threatening that Jarrod possessed months of private texts and images between Plaintiffs and that release of those materials "wouldn't be good."

251. The threatened use of unlawfully obtained intimate marital communications and images to force an official custody concession was predatory sexualized coercion and a shakedown, not legitimate advocacy.

252. If Jarrod Long truly believed the accusations in his emergency filings represented an actual imminent danger to the child, those accusations would not have been reduced to a negotiable request for one additional day of parenting time per month.

253. Jarrod Long's willingness to bargain away the supposed emergency demonstrates that the filing and the threat were used for a collateral purpose: pressure, leverage, intimidation, humiliation, and injury.

254. Jarrod Long's conduct was especially outrageous because the material he stole and threatened to use included intimate sexual communications and intimate visual depictions intended only for the spouses themselves.

255. Jarrod Long's conduct was further outrageous because it also invaded and exposed deeply private health, emotional, reproductive, financial, credential, and strategic communications.

256.     Jarrod Long's conduct was further outrageous because, after being confronted and told how appalling and nonconsensual the possession of the nude photographs and stolen messages was, he did not deny having the files but instead stated that the files had been given to his lawyer.

257.     Jarrod Long's conduct was further outrageous because he later attempted to rewrite the access under oath as benign parental conduct, including by falsely asserting that no password was required to see what the child was allegedly witnessing on the device.

258.     Jarrod Long's conduct was further outrageous because, on information and belief, he manipulated the iPad itself by restoring or re-enabling messaging functionality that Hannah Friedman had removed or disabled, concealed that restored functionality, and thereby turned a limited child-use device into a means of continuing surveillance into Plaintiffs' marriage.

259.     Jarrod Long's conduct was further outrageous because the iPad was passcode protected, the passcode mattered enough to law enforcement's retrieval of the data, and yet Jarrod later attempted to portray the device as effectively open and unprotected.

260.     Jarrod Long's conduct was further outrageous because it did not stop with the iPad intrusion.

261. Even after the unlawful access to Plaintiffs' marital communications, Jarrod Long continued to exploit mistaken access points into Plaintiffs' private affairs, including using an erroneous State Farm contact as an opportunity to pry into a post-divorce insurance claim in which he no longer had any insurable interest. State Farm's records reflect that, when contacted in connection with the claim, Jarrod asked who Joshua Friedman even was despite obviously knowing exactly who he was, and later records reflect correction of Jarrod's improper involvement in the claim file and payment stream.

262. That insurance-claim episode further reflects a pattern of predatory boundary-crossing and opportunistic intrusion: when Jarrod Long perceived an opening into Hannah and Joshua Friedman's private affairs, he exploited it rather than respecting obvious limits.

263. Jarrod Long's conduct was further outrageous because it was not followed by remorse, repentance, or meaningful accountability.

264. Even after being confronted with the violation and given an opportunity to acknowledge the harm, destroy the materials, and stop using the intrusion as strategic terrain, Jarrod Long chose denial, minimization, victim-shaming, and blame-shifting instead.

265.    In a later court filing dated December 2, 2025, Jarrod Long continued to portray Joshua Friedman as the aggressor, described efforts to challenge the fallout from Jarrod's own misconduct as "desperate," and attempted to reduce his criminal conduct to a mere "error," thereby confirming his total lack of remorse and callous indifference to the harm he caused.

266.    Jarrod Long knew, or acted with reckless disregard of the near certainty, that stealing sexually explicit and otherwise deeply private marital communications and then threatening to expose or use them for custody leverage would cause severe emotional distress.

267.    Jarrod Long knew, or acted with reckless disregard of the near certainty, that using intimate material, passwords, medical and fertility discussions, and other profoundly personal communications as leverage would humiliate, destabilize, and traumatize Plaintiffs.

268.    Jarrod Long knew, or acted with reckless disregard of the near certainty, that forcing Hannah Friedman to live with the knowledge that her former husband possessed, reviewed, preserved, and transferred intimate photographs of her body would inflict profound psychological and relational harm.

269.    Jarrod Long's conduct was not a momentary lapse in judgment, but a calculated course of exploitation. It involved deliberate acquisition, device

manipulation, retention, export, transfer, weaponization, and attempted justification of the most sensitive categories of married life.

270.    As a direct and proximate result of Defendant Jarrod Long's conduct, Hannah Friedman suffered severe emotional distress, humiliation, panic, fear, emotional collapse, loss of sexual privacy, and lasting trauma.

271.    Hannah Friedman's severe emotional injury included trauma-related symptoms, lasting fear around intimate sharing within her marriage, and PTSD-related harm requiring substantial counseling.

272.    Since learning that Jarrod Long possessed and weaponized her intimate photographs, Hannah Friedman has not again felt safe sharing intimate photographs or comparable sexual content in the ordinary trusting manner of a wife communicating privately with her husband.

273.    Jarrod Long's conduct permanently altered Hannah Friedman's sense of safety, trust, and sexual privacy within her marriage.

274.    As a direct and proximate result of Defendant Jarrod Long's conduct, Joshua Friedman suffered severe emotional distress, anguish, humiliation, strain on his marriage, reputational targeting, and continuing emotional and practical fallout.

275.    Joshua Friedman's severe emotional injury included the direct invasion of his own intimate marital communications, the humiliation of

knowing that private sexual and emotionally vulnerable communications had been stolen and weaponized, and the practical destabilization of his marriage and related legal matters.

276. Defendant Jarrod Long's conduct was willful, malicious, oppressive, callous, and undertaken with the intent to injure Plaintiffs or with conscious indifference to the certainty of such injury.

277. As a direct and proximate result of Defendant Jarrod Long's intentional infliction of emotional distress, Plaintiffs are entitled to recover actual damages, consequential damages, punitive damages, and all other relief permitted by law.

## COUNT III: VIOLATION OF THE STORED COMMUNICATIONS ACT 18 U.S.C. §§ 2701 AND 2707

278. Plaintiffs incorporate by reference Paragraphs 1 through 277 as if fully set forth herein.

279. At all relevant times, Plaintiffs' private electronic communications were stored electronically and were not authorized for access, retrieval, acquisition, export, retention, or use by Defendant Jarrod Long.

280. At all relevant times, Hannah Friedman's iPad and the communications accessible through it were used to store, sync, retrieve, back

up, or otherwise make available electronic communications exchanged between Hannah Friedman and Joshua Friedman, including through Apple iCloud or related Apple communication or storage systems. On information and belief, at least part of the communications Jarrod Long obtained were communications in electronic storage within such system or systems.

281.    Defendant Jarrod Long intentionally accessed without authorization, or exceeded any authorization to access, electronic communications or a facility through which such communications were stored, synced, retrieved, backed up, or otherwise made electronically available, including communications in electronic storage within Apple's communication or storage environment.

282.    Any limited, incidental, or practical access associated with the child's temporary use of the iPad for communication purposes did not authorize Defendant Jarrod Long to access private communications exchanged between Hannah Friedman and Joshua Friedman.

283.    Defendant Jarrod Long was not authorized to restore, reactivate, or otherwise enable messaging functionality that Hannah Friedman had removed, disabled, or limited.

284.    Defendant Jarrod Long was not authorized to use passcode-protected access, restored functionality, hidden application placement, or any

comparable device manipulation to reach Plaintiffs' private communications.

285.    On information and belief, Defendant Jarrod Long intentionally accessed private communications and related data in areas of the device or associated communication environment that were off limits to him.

286.    Through that unauthorized access, Defendant Jarrod Long obtained private communications belonging to or exchanged by Plaintiffs.

287.    The exported Decipher TextMessage PDF reflects that the stolen materials were affirmatively retrieved and exported from Hannah Friedman's iPad on February 29, 2024, rather than casually observed in passing.

288.    The materials obtained by Defendant Jarrod Long included, among other things, sexually explicit spouse-to-spouse communications, intimate visual depictions, passwords and credentials, financial-access information, medication and fertility discussions, legal and insurance-strategy communications, and private family communications.

289.    Defendant Jarrod Long acted knowingly, intentionally, and willfully.

290.    Defendant Jarrod Long's own guilty plea materials are consistent with that conclusion, as he admitted conduct charged as "knowingly and maliciously" interfering with Hannah Friedman's iPad by downloading the

text communications of Hannah Friedman and Joshua Friedman without consent.

291.    Defendant Jarrod Long cannot avoid liability by recasting the access as ordinary parental device review, because the communications he obtained were private adult spouse-to-spouse communications, not communications with or to the child, and because the facts alleged above show off-limits access rather than benign observation.

292.    As a direct and proximate result of Defendant Jarrod Long's unauthorized access to Plaintiffs' stored electronic communications, Plaintiffs suffered actual damages, including but not limited to emotional distress, humiliation, therapy and counseling expenses, relational harm, lost work, practical fallout in related legal matters, and other consequential damages.

293.    Defendant Jarrod Long's conduct was engaged in with a knowing or intentional state of mind, and Plaintiffs are persons aggrieved by the violation within the meaning of 18 U.S.C. § 2707.

294.    Defendant Jarrod Long's conduct entitles Plaintiffs to seek all relief authorized by 18 U.S.C. § 2707, including appropriate equitable or declaratory relief, damages as allowed by law, and reasonable litigation costs and attorney's fees if and when represented by counsel.

295. Plaintiffs therefore seek judgment against Defendant Jarrod Long under 18 U.S.C. §§ 2701 and 2707 in an amount to be proven at trial and as otherwise authorized by law.

## COUNT IV: VIOLATION OF 18 U.S.C. §§ 2511 AND 2520 UNLAWFUL INTERCEPTION, USE, AND DISCLOSURE OF ELECTRONIC COMMUNICATIONS

296. Plaintiffs incorporate by reference Paragraphs 1 through 295 as if fully set forth herein.

297. At all relevant times, the communications at issue were wire and/or electronic communications within the meaning of 18 U.S.C. § 2511.

298. Defendant Jarrod Long intentionally intercepted, endeavored to intercept, or, at minimum, intentionally used and disclosed the contents of electronic communications belonging to or exchanged by Plaintiffs, knowing or having reason to know that such communications had been obtained without authorization and in violation of law.

299. On information and belief, Defendant Jarrod Long's restoration and concealment of messaging functionality on the iPad was not undertaken merely to review old content once. It was undertaken to create, preserve, or facilitate continuing access to Plaintiffs' communications, including

communications as they were stored, synced, retrieved, or, to the extent applicable, received in the ordinary course through Apple's communication systems.

300. On information and belief, to the extent Defendant Jarrod Long's manipulation of the device and messaging functions permitted acquisition of communications contemporaneously with transmission, Defendant Jarrod Long violated 18 U.S.C. § 2511(1)(a) by intentionally intercepting or endeavoring to intercept such communications.

301. In all events, Defendant Jarrod Long violated 18 U.S.C. § 2511(1)(c) and (d) by intentionally disclosing and using the contents of Plaintiffs' unlawfully obtained communications.

302. Jarrod Long's use and disclosure included, without limitation, exporting the communications into PDF form, retaining them, transferring them to counsel, and using or threatening to use the contents and associated images for leverage in connection with the April 30, 2024 emergency custody proceeding.

303. Jarrod Long's own statements confirm that he transferred the files onward after acquiring them, and Plaintiffs allege that the transfer included or derived from unlawfully obtained private communications belonging to Plaintiffs.

304. The threatened use of months of texts and images in the courthouse lobby to force parenting-time concessions constituted a knowing and intentional use of unlawfully obtained communications for coercive advantage.

305. On information and belief, Defendant Stefani Rizzi knowingly participated in the use, discussion, processing, preservation, and/or disclosure of unlawfully obtained communications or their contents, including by assisting with documentation, PDF handling, escalation strategy, and discussion of the iPad and nude-image-related content.

306. On information and belief, Defendant Stefani Rizzi knew or had reason to know that the communications being used, discussed, processed, or disclosed had been obtained without authorization.

307. The communications at issue included sexually explicit spouse-to-spouse communications, intimate visual depictions, health and fertility discussions, passwords and credentials, financial-access information, legal and insurance-strategy communications, and private family communications.

308. Jarrod Long's conduct, and the conduct of Stefani Rizzi to the extent applicable, was not saved by any exception for party consent, ordinary service-provider activity, or communications readily accessible to the

general public. Plaintiffs did not consent to Jarrod's interception, use, or disclosure of their communications, and the communications at issue were private adult marital communications, not communications configured to be openly accessible to the general public.

309.    As a direct and proximate result of such interception, use, and/or disclosure, Plaintiffs suffered actual damages, including emotional distress, humiliation, therapy and counseling expenses, relational harm, lost work, practical fallout in related legal matters, and other consequential losses.

310.    Defendant Jarrod Long's conduct, and the conduct of Defendant Stefani Rizzi to the extent applicable, was intentional, willful, malicious, and knowing.

311.    Plaintiffs are entitled to the relief authorized by 18 U.S.C. § 2520, including appropriate preliminary and other equitable or declaratory relief, damages as allowed by law, punitive damages where authorized, and reasonable litigation costs and attorney's fees if and when represented by counsel.

312.    Plaintiffs therefore seek judgment against Defendant Jarrod Long, and against Defendant Stefani Rizzi to the extent applicable, under 18 U.S.C. §§ 2511 and 2520 in an amount to be proven at trial and as otherwise authorized by law.

## COUNT V: DISCLOSURE OF INTIMATE VISUAL DEPICTIONS 15 U.S.C. § 6851

313.     Plaintiffs incorporate by reference Paragraphs 1 through 312 as if fully set forth herein.

314.     At all relevant times, the materials unlawfully obtained by Defendant Jarrod Long included intimate visual depictions of Hannah Friedman within the meaning of 15 U.S.C. § 6851.

315.     Based on Plaintiffs' review of the exported image set, those depictions included at least twelve intimate photographs, including images depicting Hannah Friedman in lingerie, images emphasizing or depicting her breasts, visible nipples, buttocks, pubic region, and vagina, and shower images depicting nude portions of her body, several of which also identified Hannah Friedman by her face, body, or surrounding context.

316.     These were not generic photographs, casual selfies, or social images. They were intimate marital photographs exchanged privately between husband and wife, in trust, in vulnerability, and with the understanding that they were intended only for the eyes of Hannah Friedman's husband.

317.     Those images were never authorized for Defendant Jarrod Long's possession, retention, transfer, disclosure, or threatened use.

318.    Hannah Friedman did not consent to Jarrod Long's possession, retention, export, transfer, disclosure, or threatened use of those intimate visual depictions.

319.    Hannah Friedman did not consent to any disclosure of those intimate visual depictions beyond the marital relationship in which they were originally created and shared.

320.    Consent to create or privately share an intimate image with one's spouse does not constitute consent for Jarrod Long, Stefani Rizzi, counsel, or any other third party to possess, receive, view, transfer, or disclose that image.

321.    Jarrod Long's unlawful conduct included obtaining, retaining, exporting, and transferring a file set that included, or at minimum was understood by him to include, nude photographs and other intimate visual depictions of Hannah Friedman.

322.    After Hannah Friedman discovered that Jarrod Long possessed nude photographs of her and messages downloaded into PDF form on another device, she demanded destruction of all nude photographs, all illegally obtained messages, and all copies held by anyone else who had viewed them.

323.    Jarrod Long did not deny the existence of those materials.

324. Instead, Jarrod Long stated that he no longer had the files because they had all been given to his lawyer.

325. On information and belief, Jarrod Long's transfer of those files included disclosure of one or more intimate visual depictions of Hannah Friedman, or disclosure of a file set that contained such depictions.

326. Jarrod Long therefore disclosed, transferred, made accessible, or otherwise provided intimate visual depictions of Hannah Friedman to a third party without her consent.

327. On information and belief, Defendant Stefani Rizzi also received, viewed, discussed, processed, transferred, or otherwise was made aware of intimate visual depictions of Hannah Friedman that had been obtained without authorization.

328. The Jarrod–Stefani messages show Stefani's awareness that the iPad issue involved nude-image content, including her statement referring to "the iPad that SHE SENDS NUDES ON."

329. On information and belief, to the extent Stefani Rizzi received, viewed, processed, discussed, transferred, or otherwise made accessible an intimate visual depiction of Hannah Friedman without consent, she is also liable under 15 U.S.C. § 6851.

330. Jarrod Long knew, or recklessly disregarded, that Hannah Friedman did not consent to disclosure of her intimate visual depictions beyond the marital relationship.

331. Stefani Rizzi, to the extent applicable, knew or recklessly disregarded that Hannah Friedman did not consent to disclosure of her intimate visual depictions beyond the marital relationship.

332. Hannah Friedman was identifiable from the intimate visual depictions themselves, from accompanying information, from the surrounding communications, or from the context in which the depictions were transferred, discussed, or used.

333. Jarrod Long's disclosure and threatened use of the intimate visual depictions was malicious, predatory, humiliating, coercive, and intended to injure, pressure, control, or gain advantage over Hannah Friedman and Joshua Friedman.

334. Jarrod Long had no right to possess these images, no right to retain them, no right to export them into PDF form, no right to transfer them to anyone else, and no right to weaponize them for leverage in a custody dispute.

335. The theft and possession of these intimate photographs was uniquely violating because the images exposed the most private parts of Hannah

Friedman's body, including her breasts, nipples, buttocks, pubic region, and vagina, and because at least some of the images also identified Hannah Friedman by face, body, or surrounding context.

336. Jarrod Long's conduct therefore did not merely invade privacy in the abstract. It stripped Hannah Friedman of sexual privacy, bodily dignity, and the security of knowing that intimate images shared only within marriage would remain within marriage.

337. Jarrod Long then compounded that violation by retaining and exploiting the intimate images, exporting them into a transferable file set, and using or threatening to use the larger body of stolen texts and images as leverage in connection with official custody proceedings.

338. The resulting harm to Hannah Friedman was profound and lasting.

339. Since learning that Jarrod Long possessed and weaponized her intimate photographs, Hannah Friedman has never again felt safe sharing intimate photographs or comparable sexual content in the ordinary trusting manner of a wife communicating privately with her husband.

340. What Jarrod Long did permanently altered Hannah Friedman's sense of safety, trust, and sexual privacy inside her marriage.

341. Hannah Friedman has spent substantial time in counseling dealing with the humiliation, fear, violation, and trauma caused by Jarrod Long's conduct.

342. The emotional injury caused by Jarrod Long's possession and weaponization of Hannah Friedman's intimate photographs has included shame, mortification, hypervigilance, ongoing fear of further exposure, and a persistent inability to feel secure that her private sexual communications and images will remain private.

343. Jarrod Long knew, or at minimum acted with reckless disregard of the near certainty, that stealing and retaining intimate marital photographs of his former wife, and then using the larger body of stolen communications and images as leverage, would cause precisely this kind of trauma.

344. The harm was not speculative. It was immediate, severe, and enduring.

345. Jarrod Long's conduct forced Hannah Friedman to live with the knowledge that her former husband had viewed, possessed, preserved, and transferred intimate images of her body that were intended only for her husband, and that he stood ready to use the stolen file set as strategic pressure when it suited him.

346. That violation was horrific, degrading, and deeply traumatic.

347. As a direct and proximate result of the nonconsensual disclosure, transfer, and/or making accessible of Hannah Friedman's intimate visual depictions, Hannah Friedman suffered humiliation, emotional distress, trauma, loss of sexual privacy, counseling expenses, and other actual damages.

348. As a direct and proximate result of the same conduct, Joshua Friedman suffered emotional distress, relational harm, invasion of marital privacy, and other consequential damages arising from the theft and disclosure of intimate material exchanged within the marriage.

349. Pursuant to 15 U.S.C. § 6851, Hannah Friedman is entitled to seek actual damages or liquidated damages of $150,000, together with reasonable attorney's fees and costs if and when represented by counsel, and such preliminary and equitable relief as the Court deems appropriate.

350. Plaintiffs therefore seek judgment against Defendant Jarrod Long, and against Defendant Stefani Rizzi to the extent applicable, under 15 U.S.C. § 6851 in an amount to be proven at trial and as otherwise authorized by law.

## COUNT VI: JOINT TORTFEASOR LIABILITY / MALICIOUS PROCUREMENT OF INJURY

351.    Plaintiffs incorporate by reference Paragraphs 1 through 350 as if fully set forth herein.

352.    Under Georgia law, a person who maliciously procures an injury to be done to another, whether as an actor, counselor, adviser, encourager, or assistant, is a joint wrongdoer and may be held liable for the resulting harm.

353.    Defendant Stefani Rizzi was not a passive observer of Jarrod Long's conduct.

354.    On information and belief, and as reflected in Jarrod Long's own discovery responses, Stefani Rizzi helped originate, shape, accelerate, or operationalize at least part of the tactic, plan, or strategy by which the unlawfully obtained communications and related accusations were documented, processed, escalated, and weaponized.

355.    Jarrod Long admitted in deposition that when he "found the messages," he called Stefani Rizzi, and that she advised him regarding the app used in connection with handling, preserving, backing up, or processing those messages.

356.    The Jarrod–Stefani messages further show that Stefani Rizzi actively encouraged Jarrod to document allegations, preserve records, and escalate the conflict.

357. In those messages, Stefani Rizzi told Jarrod, among other things, that they needed to "really document these things," offered to help process records into PDF form on her phone, advised on police-report and TPO tactics, and participated in framing accusations against Hannah Friedman, Joshua Friedman, and their household.

358. The same messages show that Stefani Rizzi was aware that the iPad issue involved nude-image content, including her reference to "the iPad that SHE SENDS NUDES ON."

359. The same messages also show that Jarrod Long understood he was exposed and feared legal consequences from Joshua Friedman. In one exchange, Jarrod stated: "Josh will write up something about taking me to court and suing me."

360. Rather than responding with caution, remorse, or any suggestion that Jarrod should stop, disclose, correct, or repair the harm, Stefani Rizzi responded with a posture of resistance and escalation. She wrote: "We have to stick to the facts and not let him or them manipulate the situation or use threats as tactics to make us back down," and further minimized the risk by saying, "The worst she can do is say mean things or threaten you," and "But that's not something we should be worried about honestly. They have to prove you have done something and we know they cannot."

361. Those exchanges are evidence that Stefani Rizzi was not merely comforting Jarrod Long, but helping him persist in and exploit the wrongdoing. She was helping him hold the line, avoid accountability, and continue the strategy despite awareness that his conduct exposed him to civil liability.

362. On information and belief, Stefani Rizzi received, reviewed, discussed, processed, or otherwise materially participated in the handling of at least part of the unlawfully obtained communications and associated records.

363. On information and belief, Stefani Rizzi knew, or at minimum had reason to know, that the communications and related materials at issue had been obtained without authorization and were private marital communications belonging to Hannah Friedman and Joshua Friedman.

364. Despite that knowledge, Stefani Rizzi encouraged, assisted, participated in, or helped facilitate the documentation, retention, processing, strategic framing, threatened use, and/or disclosure of those communications and their contents.

365. Stefani Rizzi's participation was not incidental; it was active, strategic, and exploitative. It was directed toward helping Jarrod Long use

the stolen material and message-derived allegations for leverage, escalation, and strategic advantage in the custody conflict.

366. On information and belief, Stefani Rizzi also participated in surveillance-style monitoring, accusation-building, or intelligence-gathering concerning Plaintiffs' home, family life, school exchanges, and related matters, all as part of the same pressure campaign.

367. Stefani Rizzi's conduct was malicious, intentional, and undertaken with the purpose of helping Jarrod Long injure Plaintiffs, pressure Hannah Friedman, target Joshua Friedman, and gain leverage in custody-related proceedings.

368. Stefani Rizzi therefore acted in concert with Jarrod Long, or maliciously procured injury to Plaintiffs, and is jointly liable for the damages caused by the wrongful conduct alleged herein.

369. As a direct and proximate result of Stefani Rizzi's participation and procurement, Plaintiffs suffered emotional distress, humiliation, relational harm, reputational harm, practical and litigation-related fallout, and other damages in an amount to be proven at trial.

370. Stefani Rizzi's conduct was willful, malicious, oppressive, and undertaken with conscious disregard of Plaintiffs' rights, thereby supporting punitive damages to the extent allowed by law.

## V. DAMAGES

371.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and continue to suffer substantial actual damages.

372.    Those damages include, without limitation, emotional distress, humiliation, shame, fear, mortification, loss of sexual privacy, loss of emotional security, relational injury, therapy and counseling expenses, lost work time, lost income, litigation-related spillover harm, and other consequential damages.

373.    The harm to Plaintiffs was not speculative, trivial, or fleeting.

374.    Jarrod Long stole and weaponized the sexual, financial, medical, strategic, and familial interior of Plaintiffs' marriage.

375.    He did so knowingly, maliciously, and without consent.

376.    He then sought to convert that theft into strategic leverage.

377.    He helped build an emergency narrative around Joshua Friedman, used the existence of the stolen texts and images as pressure in the courthouse lobby, and reduced supposedly grave emergency allegations to a negotiable demand for one more day of parenting time per month.

378.    That conduct caused immediate and severe harm to Hannah Friedman.

379.    Hannah Friedman suffered humiliation, emotional collapse, loss of sexual privacy, and lasting trauma after learning that Jarrod Long possessed,

exported, retained, and weaponized intimate photographs and sexually explicit spouse-to-spouse communications that had been intended only for her husband.

380. Since learning what Jarrod Long did, Hannah Friedman has not again felt safe sharing intimate photographs or comparable sexual content in the ordinary trusting manner of a wife communicating privately with her husband.

381. What Jarrod Long did permanently altered Hannah Friedman's sense of safety, trust, and sexual privacy inside her marriage.

382. Hannah Friedman has spent substantial time in counseling dealing with the humiliation, fear, violation, and trauma caused by Defendants' conduct.

383. The emotional injury to Hannah Friedman has included shame, mortification, hypervigilance, ongoing fear of further exposure, and a persistent inability to feel secure that her private sexual communications and intimate images will remain private.

384. The same conduct caused immediate and substantial harm to Joshua Friedman.

385. Joshua Friedman was not merely a bystander to an injury done to someone else.

386.    The stolen communications were his communications too.

387.    Jarrod Long invaded Joshua Friedman's intimate marital communications, stole his sexually explicit exchanges with his wife, obtained his private strategic and financial discussions, and then used the fruits of that invasion to portray him as dangerous, unstable, and unfit in a custody setting.

388.    As a result, Joshua Friedman suffered emotional distress, humiliation, reputational targeting, strain on his marriage, lost work, and practical fallout in related legal matters.

389.    Defendants' conduct also caused relational damage that no ordinary damages formula fully captures.

390.    Plaintiffs' marriage was exposed from the inside out.

391.    Their sexual intimacy was stolen.

392.    Their emotionally vulnerable communications were stolen.

393.    Their passwords and credentials were stolen.

394.    Their financial and strategic discussions were stolen.

395.    Their health, fertility, and trauma-related communications were stolen.

396.    Their private family communications were stolen.

397.    And the resulting file set was not merely viewed once and forgotten.

398.    The private communications were exported.

399.    The private communications were retained.

400.    The private communications were transferred.

401.    The private communications were discussed.

402.    The private communications were threatened as leverage.

403.    The private communications were used to pressure Plaintiffs in connection with official judicial proceedings.

404.    Defendant Stefani Rizzi materially worsened the injury by helping document, process, escalate, frame, and help weaponize the stolen material and related accusations.

405.    Her participation increased the scope, reach, and pressure of the campaign against Plaintiffs.

406.    The messages between Jarrod Long and Stefani Rizzi also show that Jarrod Long understood he faced legal exposure for what he had done. In one exchange, Jarrod stated: "Josh will write up something about taking me to court and suing me."

407.    That statement is important not merely because it acknowledges anticipated litigation, but because it reflects Jarrod Long's awareness that his conduct was serious enough to expose him to suit.

408. Rather than urging accountability, apology, correction, or retreat, Stefani Rizzi responded with a posture of resistance and escalation.

409. She wrote: "We have to stick to the facts and not let him or them manipulate the situation or use threats as tactics to make us back down."

410. She further minimized the consequences by writing: "The worst she can do is say mean things or threaten you."

411. She also wrote: "But that's not something we should be worried about honestly. They have to prove you have done something and we know they cannot."

412. Those messages show not remorse, but conscious persistence.

413. They show that Jarrod Long and Stefani Rizzi were not trying to repair the harm, undo the violation, or protect Plaintiffs from further injury.

414. They were choosing to stand on the invasion, hold the stolen ground, and continue exploiting the wrongdoing as a strategic asset, despite knowing that the conduct exposed Jarrod to suit and had profoundly harmed Plaintiffs.

415. That posture aggravated Plaintiffs' damages.

416. It deepened the humiliation, confirmed the absence of remorse, and reinforced for Plaintiffs that Defendants viewed the invasion not as a wrong requiring repair, but as a usable tactical asset.

417. Jarrod Long's lack of remorse also continued well beyond the original events.

418. In a later court filing dated December 2, 2025, Jarrod Long still portrayed Joshua Friedman as the aggressor, described efforts to challenge the fallout from Jarrod's own misconduct as "desperate," and attempted to reduce his criminal conduct to a mere "error," thereby confirming his total lack of remorse and his ongoing effort to cast Plaintiffs as the villains of a story he created.

419. That continued inversion and victim-shaming further intensified Plaintiffs' emotional harm.

420. It forced Plaintiffs to endure not only the original invasion, but also the ongoing indignity of watching Jarrod Long portray himself as the injured party while refusing to accept responsibility for conduct he had already admitted in criminal proceedings.

421. The conduct of both Defendants was willful, malicious, oppressive, and undertaken with conscious disregard of Plaintiffs' rights.

422. Jarrod Long's own guilty plea admitting conduct charged as "knowingly and maliciously" underscores the malicious nature of the underlying access.

423. His later verified effort to rewrite the access as benign parental conduct underscores his bad faith and consciousness of wrongdoing.

424. The courthouse-lobby shakedown underscores the coercive, callous, and strategic nature of the injury.

425. The State Farm episode further reflects a continuing pattern of opportunistic intrusion into Plaintiffs' private affairs, reinforcing that Jarrod Long did not stop prying when he was first caught, but continued trying to insert himself into post-divorce private channels whenever an opening appeared.

426. Plaintiffs are therefore entitled to recover all actual, consequential, statutory, liquidated, and punitive damages permitted by federal and Georgia law.

427. Plaintiffs are also entitled to recover costs, expenses, attorney's fees where authorized by law, and such equitable or declaratory relief as the Court deems just and proper.

428. Plaintiffs seek recovery of all past and future mileage, travel, transportation, meal, and related incidental expenses reasonably incurred in counseling, treatment, legal meetings, court appearances, evidence gathering, and other efforts made necessary by Defendants' conduct.

429. Plaintiffs seek recovery of all time away from work reasonably incurred by both Plaintiffs in responding to the invasion, participating in counseling and treatment, addressing the resulting emotional and relational fallout, attending legal meetings, preparing for and attending court proceedings, and otherwise managing the consequences of Defendants' conduct.

430. Plaintiffs seek recovery of all medication expenses reasonably incurred as a result of the anxiety, trauma, emotional distress, sleep disruption, or other conditions caused or aggravated by Defendants' conduct.

431. Plaintiffs seek recovery of all marital-counseling expenses reasonably incurred as a result of the damage Defendants caused to Plaintiffs' trust, intimacy, privacy, and sense of safety within their marriage.

432. To the extent recoverable under governing law, Plaintiffs seek recovery of all increased legal costs and related expenses incurred in other proceedings to the extent those costs were proximately caused by the fallout from Defendants' conduct, including the need to respond to false narratives, address the effects of the unlawful intrusion, and mitigate the consequences of the weaponization of Plaintiffs' private communications and intimate images.

## VI. PRAYER FOR RELIEF

**WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants and award the relief set forth below.**

A. Compensatory damages in an amount to be determined by the jury;

B. Consequential damages in an amount to be determined by the jury;

C. Actual damages under all applicable federal and state causes of action;

D. Recovery of all past and future therapy, counseling, trauma-treatment, psychological-treatment, marital-counseling, and other mental-health expenses reasonably incurred as a result of Defendants' conduct;

E. Recovery of all past and future medication expenses reasonably incurred as a result of the emotional distress, anxiety, trauma, sleep disruption, or related conditions caused or aggravated by Defendants' conduct;

F. Recovery of all past and future lost wages, lost earning capacity, lost business income, lost productivity, and work disruption suffered by both Plaintiffs as a result of Defendants' conduct;

G. Recovery of all time-away-from-work losses reasonably incurred by both Plaintiffs in counseling, treatment, legal meetings, court appearances, evidence gathering, and other response efforts made necessary by Defendants' conduct;

H. Recovery of all mileage, travel, transportation, meal, and related incidental expenses reasonably incurred in responding to Defendants' conduct and its fallout;

I. Recovery of all out-of-pocket expenses reasonably incurred in investigating, documenting, addressing, containing, and responding to Defendants' conduct;

J. To the extent recoverable under governing law, recovery of all increased legal costs and related expenses incurred in other proceedings to the extent proximately caused by Defendants' conduct and its fallout;

K. Statutory damages under 18 U.S.C. §§ 2701 and 2707 to the extent permitted by law;

L. Damages and all other relief authorized by 18 U.S.C. §§ 2511 and 2520 to the extent permitted by law;

M. Actual damages or liquidated damages of $150,000 under 15 U.S.C. § 6851, together with any other relief authorized by that statute, to the extent permitted by law;

N. Punitive damages in an amount sufficient to punish Defendants and deter similar conduct;

O. Litigation costs, expenses, and attorney's fees where authorized by statute and if and when incurred through counsel;

P. Pre-judgment and post-judgment interest as allowed by law;

Q. Equitable and injunctive relief, including but not limited to a temporary restraining order, preliminary injunction, and permanent injunction ordering Defendants and all persons acting in concert with them to cease any display, disclosure, transfer, distribution, dissemination, retention for dissemination, or threatened use of Plaintiffs' unlawfully obtained intimate visual depictions and unlawfully obtained private communications;

R. An order requiring the return, destruction, and deletion of all copies, exports, backups, PDFs, screenshots, derivatives, and circulated versions of Plaintiffs' unlawfully obtained intimate images and private communications in Defendants' possession, custody, or control;

S. An order requiring Defendants to identify, under oath and to the fullest extent permitted by law, every person or entity to whom any of Plaintiffs' unlawfully obtained intimate images, private communications, exports, screenshots, PDFs,

backups, or derivative materials were shown, transferred, transmitted, described, summarized, or otherwise made accessible;

T. To the fullest extent permitted by law, as necessary to effectuate the Court's equitable relief, an order requiring Defendants to identify and produce all devices, accounts, storage locations, applications, cloud repositories, or other media on or through which Plaintiffs' unlawfully obtained intimate images, private communications, exports, screenshots, PDFs, backups, or derivative materials were stored, synced, transmitted, or preserved;

U. An order prohibiting any further non-good-faith or extra-judicial use, dissemination, or threatened dissemination of Plaintiffs' unlawfully obtained intimate images and private communications;

V. Such preliminary, permanent, equitable, declaratory, or injunctive relief as the Court deems just and proper; and

W. Such other and further relief as the Court deems just and proper.

**Plaintiffs demand a trial by jury on all issues so triable.**

Respectfully submitted, this **30th** day of ___ **March** ___, 2026.



Joshua Friedman, Pro Se Plaintiff

701 Sterling Reserve

Canton GA 30115

943-248-9104

joshua@friedman.nexus

and

Hannah Friedman, Pro Se Plaintiff

701 Sterling Reserve

Canton GA 30115

943-248-8333

Hannahefriedman91@gmail.com

# PLAINTIFF'S APPENDIX OF EXHIBITS

**Exhibit A**

Certified copy of criminal accusation / plea / disposition materials relating to Jarrod Long's downloading of the text communications of Hannah Friedman and Joshua Friedman without consent.

**Exhibit B**

Verified pleading filed by Jarrod Long in Cherokee County containing the statement that "[n]o password was required to see what the child was witnessing on the device."

**Exhibit C**

Text exchange / communication with Detective Botzong reflecting law enforcement's request for the iPad password in connection with retrieval of the device's data.

**Exhibit D**

Relevant emergency custody filing(s), including the emergency motion, supporting brief, and/or counterclaim filed by Jarrod Long in Cherokee County portraying Joshua Friedman as dangerous and seeking emergency relief.

**Exhibit E**

April 30, 2024 temporary consent order entered following the emergency hearing.

**Exhibit F**

Written exchange in which Hannah Friedman demanded destruction of the unlawfully obtained nude photographs and messages, and Jarrod Long stated that the files or documentation had been given to his lawyer.

**Exhibit G**

Selected excerpts of the Jarrod Long–Stefani Rizzi message thread, including excerpts reflecting documentation strategy, PDF handling, awareness of nude-image content, fear of suit, and refusal to back down.

**Exhibit H**

Decipher TextMessage export cover page / metadata page reflecting export from Hannah Friedman's iPad on February 29, 2024.

**Exhibit I**

State Farm records reflecting Jarrod Long's post-divorce contact with the claim file, including the call note, insured-status correction, and reissued-payment records.